THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT HERNANDEZ, JR., Defendant-Appellant.

Second District   No. 2—88—0518

Opinion filed August 15, 1990.—Rehearing denied November 26, 1990.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Mary Beth Burns, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE UNVERZAGT delivered the opinion of the court:

Robert Hernandez, Jr., was indicted by the Du Page County grand jury for the murder of Jolene LaRocca and the attempted murder of Mark Caccippio. The 16-count indictment included seven counts of murder, one count of attempted murder, two counts of aggravated battery, three counts of home invasion, one count of residential burglary, and two counts of armed violence. All of these charges arose out of events which occurred on April 29, 1986, at Caccippio's apartment in Downers Grove, Illinois.

The defendant pleaded guilty to count I of the indictment, which charged the murder of Jolene LaRocca with an intent to kill, and to count VIII of the indictment, which charged the attempted murder of Mark Caccippio. In exchange, it was agreed that all the other charges would be nol-prossed, and, as to sentencing, the only agreement was that the death penalty would not be sought on the murder charge. The defendant was advised that extended-term penalties—up to 80 years for murder and 60 years for attempted murder—would be possible if the circumstances of the offenses were found to have been accompanied by exceptionally brutal or heinous behavior.

The State presented a detailed factual basis for the guilty plea which may be summarized as follows. On April 29, 1986, at approximately 9:30 p.m., the defendant broke into the apartment of Mark Caccippio armed with a pipe. Jolene LaRocca, who was in the bedroom with Caccippio, took the pipe away from the defendant. The defendant rearmed himself with a pair of scissors taken from the kitchen area of the apartment. A struggle between the defendant and Caccippio then ensued during which Caccippio was stabbed seven times. Jolene LaRocca was thereafter stabbed 89 times by the defendant. She died from loss of blood due to multiple injuries to the heart, lungs, liver, and one stab wound which penetrated to the brain through her right eye. Caccippio's wounds required extensive treatment at a hospital.

The defendant was arrested at the scene, and he later made a statement to the police admitting the acts alleged. He told a detective that Jolene had informed him a few days before the incident that she was seeing Mark Caccippio and, on the day of the incident, Jolene further told him she did not want to go out with him or talk with him. Although not mentioned in the prosecutor's factual basis, the record shows the defendant and Jolene LaRocca had a long-standing relationship and that they had a three-year-old daughter, Serena Marie Hernandez.

The defendant told the police that when he did not find Jolene at home, he found out what Caccippio's address was and went to Caccippio's apartment. After listening at the door for about 20 minutes, the defendant kicked in the apartment door and observed Caccippio and Jolene, fully clothed, lying on the bed. The defendant stated he fought with Caccippio, chasing him into the hallway. Caccippio told the police the defendant stabbed him, kicked him in the head, and that the defendant tried to insert the scissors into his rectum. When the fight with Caccippio ended, the defendant went back into the apartment and saw Jolene on the phone trying to contact the police, saying, "Please hurry, please hurry." The defendant stated that he began to stab her and that he "just kept stabbing her and couldn't stop." The defendant told the police he stabbed Jolene in the face, eyes, neck and chest.

The defendant's guilty pleas were accepted by the court, and judgments of conviction were entered. A presentencing report was filed which noted that the defendant had no prior criminal record but which concluded that he has an "apparent tendency to violence" as evidenced by the circumstances of the instant offenses and by his hospitalization on three separate prior occasions as a result of injuries received in altercations.

During a lengthy eight-day sentencing hearing, a total of 28 wit-

nesses were called to the stand by both sides. There were also several stipulations of testimony, and victim impact statements were introduced. Defense counsel's objection to the conclusional statement in the presentencing report about the defendant's "tendency to violence" was overruled. Defense counsel also had specific objections to each victim impact statement as it was orally presented, and portions of the statements were ruled improper by the court. The court did not exclude all portions of the statements relating to the suicide death of Jody LaRocca, Jolene's brother, which suicide was felt by those making the statements to have been caused in part by Jolene's murder.

In addition to presentation of the victim impact statements, the State's evidence during the sentencing hearing included the testimony of Mark Caccippio and various police officers whose testimony essentially repeated the circumstances of the offenses previously set forth in the factual basis provided by the prosecutor at the guilty plea proceedings.

During presentation of its case during sentencing, the defense called 16 witnesses to the stand, including the defendant. A number of character witnesses—four neighbors, three friends and three co-workers—testified on behalf of the defendant. They stated that the defendant was a nonviolent person, an honest man and good worker. A clergyman testified that the defendant had become a spiritual leader in jail, and a corrections officer described him as a model prisoner. The defendant's sister and father also testified on the defendant's behalf.

Taking the stand on his own behalf, the defendant denied that he had a prior tendency to violence as suggested in the presentence report. He explained the three prior incidents which were in the presentence report: in 1980, he broke up a fight between his brother and one of Jolene's brothers, and, while doing so, a third man unexpectedly hit him in the face with a car jack. In 1981, he was involved in a scuffle over a parking place and was hit with a bat. Then, in 1982, he crashed a party, and, as he was leaving, the intoxicated host hit him with the butt of a gun.

The defendant also provided a summary of his relationship with Jolene LaRocca. They met in 1979 while in high school, and "it was love at first sight." Until 1981, they lived together as a couple, with few problems. In 1981, Jolene had an abortion with his concurrence. They resumed their relationship thereafter and their daughter, Serena, was born on November 18, 1983, during a period in which they were living in the basement of the defendant's parents' home. They frequently discussed marriage, although they had some disagreements, and they continued to live in the defendant's parents' house until 1985.

They then moved into an apartment in Westmont and both worked. Jolene moved out of the apartment in August or September 1985, but she continued to see him on a frequent basis. Eventually, he moved back to his parents' house and turned the apartment over to Jolene, where she lived with the baby and Jolene's sister, Danielle LaRocca. In March 1986, he and Jolene again talked about getting married and went as far as to ask friends to stand up for them at the wedding.

The defendant testified that, on Sunday, April 27, 1986, two days before the incident at the Caccippio apartment, he, Jolene and their daughter spent a pleasant day together. He spent the next night with Jolene at her mother's house. During the night, Jolene revealed the full extent of her relationship with Mark Caccippio. Jolene had previously told the defendant that she had dated another man, but the defendant believed this relationship was not serious. He was upset when Jolene told him that she had slept with Caccippio. She assured the defendant, though, that he was "better in bed" than Caccippio. By morning, he and Jolene had renewed their relationship and still contemplated marriage.

On the day of the incident, he met Jolene and her mother after work at a pizza place. He and Jolene made plans for an evening together. Jolene later cancelled their date, stating over the telephone that she felt ill. The defendant wanted to talk with Jolene about their contemplated marriage, so he drove over to her mother's house and found her car was gone. A subsequent telephone call to Jolene's mother confirmed that she was out of the house. When the defendant also determined that Jolene was not at the apartment, he suspected that she might be seeing Mark Caccippio.

He learned Caccippio's address by calling directory assistance. He went to that address and found Jolene's car in the parking lot. The defendant picked up a "little bar" (a pipe) for protection and went inside the building. He listened at the door of the apartment. When he heard Jolene talk about leaving, he unscrewed some light bulbs in the hallway so he would not be seen. Then, because she did not come out, he tried to get in by removing a ceiling tile. Finally, upon hearing what he thought was kissing, the defendant broke through the door and entered the apartment. He testified that his sole purpose was to get Jolene out and that he did not intend to hurt anybody.

Jolene and Caccippio were on the bed fully clothed except that Jolene's pants were unzipped and her shoes were on the floor. In Caccippio's testimony, when the defendant broke down the locked door and entered the apartment, Jolene stated, "Bob, don't you touch him," and the defendant, breathing heavily, stated to Caccippio, "Come on, moth-

erfucker; come on motherfucker." The defendant's testimony was that Jolene got off the bed and "came at" him in a state of rage. She took the bar away from him and told him, "If you don't get out of here right now, you'll never see your daughter again." According to Caccippio's testimony, the defendant punched Jolene in the face twice with his left hand after she took the bar away from him. The defendant's testimony was that he tried to leave the apartment, but that Jolene pulled his hair from behind. As he fell, he saw Caccippio holding the bar. The defendant then took a pair of scissors from a pencil-holder cup in the kitchen and stabbed Caccippio in the stomach. The struggle between the defendant and Caccippio continued into the hallway, and the defendant testified he could only remember "pieces" of what occurred. He could not remember stabbing Jolene. He only remembered seeing "black" and "red" and "walking." He described himself as "being out of control."

The defendant stated he was remorseful over the incident and did not believe he was guilty of premeditated murder. He testified that he pleaded guilty because he was afraid of the death penalty.

Also on behalf of the defendant at sentencing, the defense called the two expert witnesses who were the subject of the State's previous pretrial motion *in limine*, Dr. Lisa Robbin Grossman and Dr. William S. Kusick. Prior to entry of the defendant's guilty plea, the court granted the State's pretrial motion to exclude the doctors' testimony at trial on the basis intense passion is a state of mind which is not a mental defect or disorder that may be established by psychiatric testimony.

After examining the defendant for five hours on two separate occasions and studying the police reports concerning the case, Dr. Grossman testified at the sentencing hearing she found no evidence of psychosis or a thinking disorder. Dr. Grossman believed the defendant was a young man with "strong feelings of inadequacy and low self-esteem" who has "strong needs for affection." She concluded: "He is especially vulnerable to situations that would challenge his masculinity or sources of dependency, and under these kinds of circumstances, he could have trouble putting things in perspective and controlling any emotional outbursts." Regarding the incident in question, she stated she believed he

> "was under severe emotional disturbances, and that given the fact that he felt that his world was collapsing, that what was most important to him was being taken away from him, that given his strong dependency needs, feeling that Jolene was no longer was going to take care of him and be there for him, that

given all that, coupled with the fact that she was threatening not to let him see his daughter, threatening his manhood, saying that, take this like a man, and then actually grabbing him, caused a state of uncontrolled frenzy and rage \*\*\* [which] was an intense and sudden passion \*\*\* evoked by the psychological, emotional distress, coupled with the actual, physical grabbing and fighting."

Dr. Grossman further believed that the defendant had the opposite intention of wanting to kill Jolene; he wanted her to be his wife, to live with her and be with her but that he was out of control. Dr. Grossman believed his remorse was sincere.

Dr. Kusick examined the defendant on one occasion for about 1½ hours. He determined the defendant "was a rather naive, immature individual who showed no evidence of any psychiatric illness, and a rather, almost happy-go-lucky attitude toward life." Based on his examination of the defendant, it was the doctor's opinion that the defendant was confused and frustrated when he entered Caccippio's apartment; that he did not know what he was going to do; that he was acting under sudden, intense passion; and that he had a true blackout. As to whether the defendant would be capable of such acts again, it was the doctor's opinion that this experience was unlikely to recur.

The State called four witnesses in rebuttal. Kelly Hoseman, Jolene's girlfriend since sixth grade and the one who introduced the defendant and Jolene when they were sophomores in high school, described the defendant as being "low keyed, but jealous of Jolene." Hoseman was present on one occasion in which the defendant hit Jolene, and she was on the telephone with Jolene in 1986 during a time when the defendant was throwing glasses at Jolene. George Manseau, the defendant's supervisor at work, related a conversation he once had with the defendant in which the defendant said that if he knew Jolene was going out with another man, he might kill Jolene or the man. Shirley LaRocca, Jolene's mother, testified that on the day of the incident Jolene asked a friend, Bob Kittle, not to tell the defendant she was trying to decide whether it would be better for the baby for her to settle down with the defendant or with Mark Caccippio because, she said, the defendant would kill her if he found out.

Jolene's sister, Danielle LaRocca, also testified in rebuttal. She provided some details of various fights the defendant had with Jolene, plus a fight which he had with Jolene's brother, Jamie. The defendant's jaw was broken as a result of the altercation with Jamie, and for a while the defendant held a knife, but he eventually turned the knife over to his father and then went to the hospital for treatment. Danielle

next testified about a card party in 1981 during which the defendant followed Jolene into the bathroom and hit her in the face. Also, during the summer of 1983, Jolene was beaten by the defendant. Danielle did not see this beating, but she saw a scratch on Jolene's face and "bruises around her neck." A fourth incident related by Danielle occurred on Thanksgiving day in 1984. Danielle heard Jolene screaming upstairs, and, when Danielle ran to her sister's aid, she observed the defendant yelling obscenities and accusing Jolene of cheating on him. The defendant at one point held his baby daughter in one arm while he threw objects at Jolene with his other arm. Danielle ran from the house in a "state of panic" and drove to the police department. Danielle called the police one other time in 1985 because the defendant called her "filthy names" on the telephone.

Testifying in surrebuttal, the defendant denied the substance of the State's rebuttal testimony. He explained that the 1981 incident testified to by Kelly Hoseman was actually a fight between Jolene and a 16-year-old girl named Valerie Arrington Burroughs, whom he had brought into his house to use the telephone. Jolene grabbed Valerie, thinking she was having a romantic encounter with the defendant, and the defendant had to pull Jolene off of Valerie. The card party argument, according to the defendant, did not involve any hitting, pushing, or choking. He testified that he never choked Jolene. The Thanksgiving fight arose because Jolene thought he had stayed out too late. He related that Jolene came at him and he had to hold her down. During the scuffle, Danielle entered and grabbed him. He stated that he pushed Danielle away but did not hit her. He further testified that the baby was not in the room at the time because she was sleeping in another room with his sister, Margaret. With regard to the fight with Jolene's brother in which his jaw was broken by a tire jack, he explained that he came home in a "daze" afterward, and at one point he held a "plastic bayonet" in his hand, but he never threatened anybody with it. His surrebuttal testimony was supported by Margaret Hernandez, Valerie Burroughs, and the surrebuttal testimony of his father, Robert Hernandez, Sr.

Following arguments of counsel, the court below sentenced the defendant to concurrent prison sentences of 80 years for his murder conviction and 30 years for his attempted-murder conviction. In the court's opinion, an extended-term penalty was appropriate because the defendant's behavior was "exceptionally brutal and heinous."

The defendant first contends his 80-year extended-term sentence is excessive in light of the fact he had no prior criminal record, he pleaded guilty, and the instant offenses were provoked by a "sudden

intense passion," which is unlikely to recur. We find the sentence is not excessive.

■ The weight to be accorded each factor in aggravation and mitigation in setting a sentence of imprisonment depends on the circumstances of each case. (*People v. Lewis* (1980), 89 Ill. App. 3d 15.) As long as the court does not consider incompetent evidence, improper aggravating factors, or ignore pertinent mitigating factors, it has wide latitude in sentencing a defendant to any term within the statutory range prescribed for the offense. (*People v. Brown* (1990), 195 Ill. App. 3d 78.) The balance which is to be struck amongst the aggravating and mitigating factors is a matter of judicial discretion which should not be disturbed on review absent an abuse of that discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149.) The imposition of a sentence is an abuse of discretion only when the judgment of the trial court is manifestly unjust or palpably erroneous. *People v. Anderson* (1986), 112 Ill. 2d 39; *Brown*, 195 Ill. App. 3d at 87.

■ That the defendant was a first-time offender is no more than a mitigating factor which is to be considered by the court along with all the other mitigating and aggravating factors. (*People v. Tatum* (1989), 181 Ill. App. 3d 821.) A defendant's lack of a prior record is not necessarily the most persuasive consideration at sentencing (*People v. Edens* (1988), 174 Ill. App. 3d 1033), and, in fact, the seriousness of the crime has been called the most important factor to be considered in imposing sentence (*People v. Johnson* (1987), 159 Ill. App. 3d 991, 1001).

Although the court clearly was cognizant of the defendant's clean prior criminal record, it was also aware of several prior incidents which involved the defendant and physical violence. It also undoubtedly considered the exceptional brutality and heinousness of the defendant's act to be of paramount importance in imposing the 80-year extended-term sentence. The record plainly shows the brutality of the crime.

■ The fact that the defendant pleaded guilty is not a statutory factor in mitigation. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.1.) However, charge and sentence concessions may properly be granted a defendant who enters a plea of guilty. (*People v. Sivels* (1975), 60 Ill. 2d 102, 104-06; A.B.A. Standards for the Administration of Criminal Justice, Standards Relating to Pleas of Guilty, §1.8, at 58 (1974).) Leniency in sentencing has been acknowledged to be available to a defendant who has admitted his guilt and shown a willingness to assume responsibility for his conduct or who has cooperated in the successful prosecution of other offenders. *People v. Bergman* (1984), 121 Ill. App. 3d 100.

The State argues, and we agree, that neither of those situations applies to this defendant. No other offenders were involved, and the defendant has never unqualifiedly acknowledged his responsibility for murdering Jolene. We note the 14 other counts which were nol-prossed in exchange for the defendant's guilty pleas to murder and attempted murder represent a substantial concession to the defendant. Over and above that, the sentences imposed show the judge impliedly rejected the State's recommendation that he impose either natural-life or consecutive sentences. In sum, we believe the record shows the mitigation value of the defendant's guilty plea was favorably considered by the court.

We reject the defendant's further contention that the probable existence of a diminished mental state was a strong mitigating factor. Relying on *People v. McCarthy* (1989), 181 Ill. App. 3d 208, he argues he may have been entitled to voluntary manslaughter instructions predicated upon the sudden, intense passion provoked in him "by the sight of the woman he loved in the arms of another man."

■ In Illinois, only four situations have been recognized as engendering the type of "serious provocation" which warrants partial or incomplete exoneration for the commission of a homicide. They are: (1) substantial physical injury or assault; (2) mutual quarrel or combat; (3) illegal arrest; and (4) adultery with the offender's spouse. (*People v. Crews* (1967), 38 Ill. 2d 331, 335-36.) Mere words, no matter how insulting—and including those which carry messages of adultery—are not sufficient provocation for a voluntary manslaughter. *People v. Chevalier* (1989), 131 Ill. 2d 66, 71-72.

In *McCarthy*, the victim, Adrianne Neal, and the defendant had dated since they began high school in 1974. They never married, but they had one daughter in 1978 and another in 1981. In April 1983, Adrianne and the children moved out of the apartment they shared with the defendant. On June 7, 1983, the defendant forcibly entered Adrianne's apartment and found her and another man dressed in their underwear in bed, and he shot both of them. The man escaped, but Adrianne died as the result of five close-range shots.

On appeal from his conviction of murder and his 34-year sentence, the court agreed with the defendant that the trial judge had erred in refusing defense counsel's tendered instructions on the offense of voluntary manslaughter. The court believed that such a verdict should be an available option even in the absence of a marital relationship and that the evidence in the case warranted the use of such an instruction. Accordingly, it reversed and remanded the cause for a new trial.

The supreme court reversed the *McCarthy* decision. In reversing,

the supreme court did not decide whether the category of serious provocation already recognized in instances of spousal adultery should be enlarged to include unmarried persons who share a marital-type relationship. Rather, it focused on the fact that the relationship had broken off two months before the homicide occurred. In declining to fashion a rule that would permit use of the voluntary manslaughter instruction when the relationship in question has effectively ended, the court adhered to previous cases, which stated that the provocation of adultery will not warrant use of the voluntary manslaughter instruction when the spouses are already divorced. (*People v. McCarthy* (1989), 132 Ill. 2d 331, 341-42.) Further, the court found no evidence apart from the defendant's own testimony that his actions were engendered by the "sudden and intense passion" required by statute. (Ill. Rev. Stat. 1983, ch. 38, par. 9—2(a)(1).) Rather, the court felt the defendant's actions suggested he "was stalking the victim and intended to kill her."

■ Similarly here, although Jolene and the defendant were engaged in a sexual relationship and produced a child, Jolene and the child moved out of the apartment they shared with the defendant in August or September 1985. This was about the same time Jolene began seeing Mark Caccippio. Although she and the defendant saw each other frequently after that time, talked about getting married, and slept together on occasion at several different residences, they never resumed the close relationship they shared prior to August 1985.

Additionally, as in *McCarthy*, the trial judge here did not believe the defendant's acts were provoked by a sudden and intense passion, and we agree. The fatal intensity of the defendant's desire to possess Jolene exclusively was presaged by remarks he made to his supervisor, George Manseau (that he might kill Jolene or the man if he found out she was seeing someone else) and was apparent to Jolene, as well, on the very day she was killed (when she asked Bob Kittle not to tell the defendant she was debating whether settling down with him or Mark Caccippio would be in the baby's best interest or the defendant would kill her). Also as in *McCarthy*, the record shows the defendant literally stalked Jolene. The defendant's extensive effort to locate Caccippio's apartment, the stealthy entrance into the apartment building, the 20 minutes of eavesdropping, unscrewing of light bulbs and removal of ceiling tile in the hallway, and the violent entry into Caccippio's apartment after the defendant believed he heard kissing and an invitation to Jolene to stay the night all confirm that his subsequent acts were not provoked suddenly but, rather, were the vengeful conclusion of his successful hunt for the self-confessed cheating woman.

We note also that although the defendant testified at sentencing

that he could not remember stabbing Jolene, the record shows the defendant told the police he began stabbing her, that he "couldn't stop," and that he stabbed her in the face, eyes, neck and chest. This significantly undercuts the theory that he suffered a blackout during the fatal stabbing of Jolene. We see no parallel between this case and *People v. Andrews* (1989), 132 Ill. 2d 451, cited by the defendant in his reply brief. In *Andrews*, a robbery victim was shot once and killed. The defendant received an extended-term sentence of 70 years for the murder conviction. The trial court concluded that an extended term was warranted because "the murder was senseless and unresisted." On appeal, the court noted that all murders are brutal and heinous to a certain degree and that many murdered robbery victims are defenseless when killed. Accordingly, since the shooting was not "exceptionally" brutal or heinous, an extended-term sentence was not warranted on that basis. Moreover, the court noted, the defendant had no criminal history of violence (only theft and burglary), he had not premeditated the shooting, and his expressions of remorse at sentencing were accepted by the trial judge as sincere.

In the case at bar, the court rejected the defendant's theory that he acted under a sudden intense passion, and the manner in which Jolene's death was accomplished stands virtually as a definition of the phrase "exceptionally brutal or heinous behavior indicative of wanton cruelty" which far outweighs the mitigating factors argued by the defendant.

In light of the evidence, we find the defendant's 80-year extended-term sentence for the brutal murder of Jolene LaRocca is not excessive, was not an abuse of the court's discretion and does not depart from the fundamental spirit and purpose of the law.

The defendant next contends his extended-term sentence must be vacated because the aggravating factor of the extended-term statute under which his sentence was predicated, *i.e.*, "exceptionally brutal or heinous behavior indicative of wanton cruelty," is unconstitutionally vague under the eighth amendment. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(2); U.S. Const., amend. VIII.) He acknowledges this issue was not raised below, but he correctly cites *People v. Bryant* (1989), 128 Ill. 2d 448, in support of the proposition that a constitutional challenge to a statute may be raised at any time. Accordingly, this issue will not be considered waived.

■ As the defendant concedes, the question of the constitutionality of this aggravating factor under the eighth amendment's proscription against cruel and unusual punishment has been considered and found to be without merit in *People v. Peeples* (1989), 184 Ill. App. 3d

206. The Illinois Supreme Court denied leave to appeal in *Peeples* subsequent to the filing of the defendant's brief. (*People v. Peeples* (1989), 127 Ill. 2d 633.) Also subsequent to the filing of the defendant's brief, this court has had occasion to consider an eighth amendment challenge to this same aggravating factor in *People v. Brown* (1990), 195 Ill. App. 3d 78. We concluded there that *Peeples* controlled, inasmuch as the defendant had not raised a proportionality challenge to his term-of-years sentence. (*Brown*, 195 Ill. App. 3d at 91.) In the absence of such a challenge, the eighth amendment analysis in *Maynard v. Cartwright* (1988), 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853, which was controlled by *Godfrey v. Georgia* (1980), 446 U.S. 420, 64 L. Ed. 2d 398, 100 S. Ct. 1759, applies only in death penalty cases and does not apply to an extended term of imprisonment. *Brown*, 195 Ill. App. 3d at 89.

We further determined in *Brown* that, even absent the qualifying age limitation present in *People v. Odle* (1988), 128 Ill. 2d 111, under the similarly worded death penalty statute (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(7)) (victim "under the age of 12"), the extended-term statute was not unconstitutionally vague under the eighth amendment in light of the qualification that the offense be "indicative of wanton cruelty" as well as exceptionally brutal or heinous. (*Brown*, 195 Ill. App. 3d at 90-92; see also *People v. Page* (1990), 193 Ill. App. 3d 467; *People v. Fyke* (1989), 190 Ill. App. 3d 713; *People v. Barnhill* (1989), 188 Ill. App. 3d 299, *appeal denied* (1990), 129 Ill. 2d 566.) Accordingly, we conclude this issue is without merit.

■ The defendant's final contention is that he should be afforded a new sentencing hearing because the trial judge was improperly influenced by the victim impact statements of Jolene's mother, sister and father. Each of those statements tended in part to suggest that the defendant's murder of Jolene was the cause of the subsequent suicide of Jolene's brother, Jody.

Specifically, the victim impact statement of Jolene's mother, Shirley LaRocca, included the following statements:

"There were many nights I sat up and tried to calm my son Jody because he was crying for his sister. He never forgave himself for not being there when she needed him most. I hope with all my heart that the two of them are together and happy at last. In the early morning hours of February 22, 1987, my son Jody committed suicide. I do put some of the blame on Robert Hernandez, Jr. [e]ven though he, himself, did not to [*sic*] this, he does have a part in it.

Because of finding my son's body in my home, I had to move,

causing more pressure on me, more time off work and more sorrow and grief."

The victim impact statement of Jolene's sister, Danielle LaRocca, included these statements:

"I welcome this opportunity to finally stand and be heard, and I would like to state that as I speak these words ***. Jody discussed his feelings with me on many occasions, and I know the loss of our sister, Jolene, disturbed him deeply as did his sense of failure and guilt ***. I do firmly believe Jolene's death had a definite affect [sic] on Jody's already troubled mind, and perhaps the perpetual visualization of his mutilated sister was the final torment that lead him to commit suicide on February 22, 1987.

* * *

I have never known pain so consuming as knowing that my sister is never coming back. I now feel another loss—that of my brother Jody. As we grew up, she was there on my left, he on my right, and today, I stand before you, alone."

And, finally, the victim impact statement of Jolene's father, Tony LaRocca, included these statements:

"Because of Bob killing Jolene, Jody didn't care for his life or anybody. Jody is my youngest son, age 26. My three youngest, Danielle, Jody and Jolene, were very close to each other because they are a year apart. Jody took care of his sisters while growing up. Jody felt the way I feel about losing his baby sister. He started to drink heavily and getting into a lot of fights. He just didn't care for his life or who he hurt. He was so depressed and troubled that he could not adjust to the idea of his sister murdered the way she was. He lost his job too. He was always thinking of Jolene. Life to him stopped. He got himself drunk on Saturday, February 21, 1987, [and] he came home drunk, real drunk [and] he didn't know what he was doing that's how drunk he was. He sat in a closet and tied a cord to the pole and the other end around his neck and being so drunk he passed out, kneeled over in his sleep and killed himself. At this moment, I feel like doing the same thing."

In imposing sentence, the court commented that it considered the fact of Jody's suicide "[not as] a factor in coming to the decision as to the appropriate sentence to be imposed, but I considered that fact in terms of the impact upon members of [Jolene's] family, the way they felt, to some extent, that that may have been as a result, indirectly, at least, of the conduct of this defendant."

The defendant acknowledges that it has been held that victim impact statements may be used in noncapital cases (*People v. Scott* (1989), 180 Ill. App. 3d 418; see also *People v. Turner* (1989), 128 Ill. 2d 540, 577-78; *People v. Young* (1989), 187 Ill. App. 3d 977) as opposed to capital cases, where they can result in an unfair sentencing decision because they create a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner. (See *South Carolina v. Gathers* (1989), 490 U.S. 805, 810-11, 104 L. Ed. 2d 876, 882-83, 109 S. Ct. 2207, 2210-11; *Booth v. Maryland* (1987), 482 U.S. 496, 501-06, 96 L. Ed. 2d 440, 448-50, 107 S. Ct. 2529, 2533-34.) He further acknowledges that even though a judge always makes the sentencing decision in a noncapital case, judges are not totally immune from the effect of irrelevant information, and the causal connection between Jolene's murder and Jody's suicide was simply too tenuous for the court to consider it in imposing sentence. In support of the irrelevancy of the suicide, the defendant cites *People v. Johnson* (1976), 43 Ill. App. 3d 649 (the fact that a rape victim's husband deserted her shortly after the crime was irrelevant matter). In light of the "considerable amount of mitigation" presented on his behalf during the sentencing hearing and the maximum 80-year extended-term sentence imposed, the defendant believes the judge was improperly influenced by the impact statements.

First, we note that *People v. Johnson* does not support the defendant's argument of irrelevancy. In that case, the information found irrelevant was not introduced by way of a victim impact statement, nor, in fact, was it introduced during sentencing. Rather, the references to the rape victim's husband's desertion of her were made by the prosecutor during opening and closing arguments and direct examination of the victim at trial. (*Johnson*, 43 Ill. App. 3d at 659.) Such references clearly were irrelevant at the guilt phase of the proceedings.

Second, although we agree defendant's argument of irrelevancy has some merit, we believe the record shows his sentence was not affected thereby and no new sentencing hearing is warranted.

Section 6 of the Bill of Rights for Victims and Witnesses of Violent Crime Act (Ill. Rev. Stat. 1985, ch. 38, par. 1406), which gives crime victims and members of their immediate families (Ill. Rev. Stat. 1985, ch. 38, par. 1403) the right to present a statement detailing the effect crime has had on them, was enacted by the legislature in recognition of the fact that the harm flowing from the defendant's criminal act affects not only the victim but the victim's immediate family. (*People v. Lewis* (1990), 197 Ill. App. 3d 438.) In determining that victim impact statements were irrelevant in the unique circumstance of a capital sen-

tencing hearing, the supreme court in *Booth* nevertheless noted that such statements, describing the "full range of *foreseeable consequences* of a defendant's actions[,] may be relevant in other criminal and civil contexts." (Emphasis added.) *Booth*, 482 U.S. at 504, 96 L. Ed. 2d at 449, 107 S. Ct. at 2533.

We do not believe the suicide of the victim's brother here was a foreseeable consequence of the defendant's actions in murdering Jolene. However, the trial judge carefully excused from his sentencing consideration those portions of the victim's statements which purported to attribute blame for the suicide to the defendant, retaining only those portions which directly related to the feelings and mental status of the witnesses. He also explicitly stated he did not consider the suicide as a factor in his decision as to the appropriate sentence to be imposed. We believe the judge's comments reflect his acute awareness that the defendant's sentence should not reflect that he caused this second tragedy in the victim's family. The defendant's father testified, in fact, that Jolene's mother, Shirley LaRocca, mentioned to him the night of the suicide that Jody left a note concerning Jody's girlfriend, Wanda. The defendant's sister, Margaret, testified she spoke with Jolene's mother that same night. Shirley told her that Jody left a note stating something to the effect that his girlfriend, Wanda, "was playing games with him" and "[n]ow I can be with Jolene." Clearly, evidence of the note reveals that the reasons for Jody's suicide were complex. Certainly, however, it also poignantly suggests Jody's deep sense of loss after his sister's murder.

Although we do not believe the defendant could have foreseen such a remote consequence of his conduct as Jody's suicide, we also do not believe the defendant's sentence was aggravated improperly by references to the suicide which were contained in the victims' impact statements.

Accordingly, we conclude the defendant is not entitled to a new sentencing hearing.

The judgment of the circuit court of Du Page County is affirmed.

Affirmed.

INGLIS and DUNN, JJ., concur.