**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 210053-U

Order filed March 23, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| Plaintiff-Appellee, | ) | Tazewell County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-21-0053 |
| | ) | Circuit No. 19-CF-543 |
| | ) | |
| MICHAEL S. ENGEL, | ) | Honorable |
| | ) | Katherine S. Gorman, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court.
Justices McDade and Schmidt concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   The circuit court did not abuse its discretion when it sentenced the defendant to the maximum term of seven years' imprisonment.

¶ 2    The defendant, Michael S. Engel, pled guilty to two counts of aggravated criminal sexual abuse. The circuit court sentenced him to seven years' imprisonment. The defendant appeals.

¶ 3                                I. BACKGROUND

¶ 4    In October 2019, the State charged the defendant by information with three felonies that

allegedly occurred in Mackinaw, Illinois. Count I alleged criminal sexual assault (720 ILCS 5/12-13(a)(3) (West 1996) now 720 ILCS 5/11-1.20(a)(3) (West 2018)) in that the defendant committed an act of sexual penetration upon M.E. in that he made contact between his mouth and the penis of M.E., who was under 18 years of age at the time of the offense and a family member of the defendant. Count II alleged aggravated criminal sexual abuse (720 ILCS 5/12-16(b) (West 1996) now 720 ILCS 5/11-1.60(b) (West 2018)) in that the defendant committed an act of sexual conduct upon M.E. when the defendant caused M.E. to touch the defendant's penis for the purpose of the defendant's sexual gratification or arousal and M.E. was under the age of 18 at the time of the offense and a family member of the defendant. Count III alleged aggravated sexual criminal abuse (720 ILCS 5/12-16(b) (West 1996) now 720 ILCS 5/11-1.60(b) (West 2018)) in that the defendant knowingly committed an act of sexual conduct upon M.E. in that the defendant touched M.E.'s penis for the purpose of the defendant's or M.E.'s sexual gratification or arousal and at the time of the offense M.E. was under 18 years old and a family member of the defendant. The State alleged that these acts occurred between October 13, 1997, and October 12, 2001, and the defendant was subject to an extended statute of limitations. M.E. is the defendant's biological, now adult, son (born October 1983).

¶ 5        The defendant pled guilty to counts II and III, and the State dismissed count I. There was no agreement as to sentencing. Counts II and III were Class 2 felonies subject to concurrent terms of four years' probation or three to seven years' imprisonment. Day-for-day sentencing applied with two years' MSR and lifetime sex offender registration. The matter proceeded to sentencing.

¶ 6                              A. Presentence Investigation Report

¶ 7        The presentence investigation (PSI) report provided that the defendant was retired but he mows lawns to keep himself busy. His work history included working with disabled children and

2

adults. A former employer, where the defendant worked with adults with developmental disabilities, provided that there were no instances of policy violations but there were interactions with male residents that made some staff uncomfortable, such as when the defendant took the male residents to his house to go swimming. The former employer provided, in general, the issue involved the defendant being too physically close, and he was terminated for this behavior.

¶ 8 During the interview, the defendant detailed instances of sexual abuse in his own childhood. Also, the defendant blamed M.E.'s wife for the trouble he was in because she was a counselor and pushed M.E. to go to the police. The defendant stated "[M.E.] knows I was just teaching him." He also stated that he did not believe that M.E. would be able to put together such a detailed victim statement without assistance. The defendant was hurt that M.E. went to the police. He stated that he did not believe that he did anything wrong, and he did not know why he did not have a relationship with either of his sons because he was only trying to help M.E. understand his body. When asked why he committed the offense, the defendant stated that he thought he was instructing M.E., they had an open relationship, and M.E. was slow and not understanding.

¶ 9 When the defendant was asked if he believed what he did was a crime, he stated

"I did it as I thought I was teaching him about his body, it dawned on me what he wanted. It is pretty upsetting that he has turned on me like this, I don't think I deserve to go to jail over this. I'm not out looking for people to molest. *** I don't feel I raped him."

He went on to state

"I started talking to my son about sex. I showed him how to wash and clean himself when we showered together. Did I touch him? Yes. I showed him his penis will get hard, and I told him things about masturbation. He had a thing where he liked to

tickle his stomach, must have come across his penis, next thing I knew he ejaculated. I was scared, then he would ask me to tickle his stomach, then we would have another sex talk. When he was a teen he did have his shirt off then he took his pants off and wanted me to play with it. I didn't for long. He watched me masturbate three or four times. I never made him touch it, he did it on his own accord."

¶ 10    The report also explained that the defendant blamed his other son C.E. for exposing his pornography addiction. While recalling the past, the defendant became angry and said that C.E. installed spyware on his computer to see what he was doing. The report concluded that the defendant's protective factors included his lack of criminal history, his financial status, and his lack of a substance abuse history. His risk factors included the lack of support the defendant receives from his family and his failure to take responsibility for his actions in the offense.

¶ 11                                  B. Sex Offender Evaluation

¶ 12    The sex offender evaluation summarized that the defendant (1) acknowledged having committed elements of the sexual offenses, (2) was able to intellectually understand the legal consequences involved for an adult engaging in sexually inappropriate contact with a minor, (3) was able to understand the psychological and sociological impact of adults engaging in sexual contact with children, (4) verbalized remorse for his abusive behaviors against M.E., and (5) denied sexual attraction to pre-pubescent or pubescent children. However, the evaluator believed that, based on the defendant's conduct, it appeared likely that the defendant underreported his sexual attraction and/or interest in minors either on a historic or current basis. The LSI-R identified the defendant as a low risk for future sexual/violent and general criminal recidivism. His combined STATIC-99R and STABLE-2007 sexual re-offense risk was identified in the very low risk range. The defendant was deemed an appropriate candidate for sex offender treatment. Goals of treatment

4

included full acknowledgement of personal responsibility for illegal sexual behaviors, identifying factors that contributed to his sexual offending, understanding his offense cycle, and continuing development and enhancement of his empathetic understanding of his sexual behavior and the consequences created for the victims and/or others involved.

C. Testimony

1. M.E.

M.E. testified that the defendant was his father and that he currently resided in Indiana with his wife and three-year-old daughter. M.E. stated that while he was suffering from sexual abuse, his mother was mentally unstable. She was very nervous and anxious. M.E. stated that he never wanted to do anything to make her upset or nervous. He feared that she was at a point where she could take her own life. He recalled an incident when he was in high school and he told his mother the things the defendant was doing to him and she said, "you will not F-ing tear this family apart." At that point, he felt it was best to be quiet about the situation with the defendant. This did not appear to be the only instance of abuse of which M.E.'s mother was aware. When M.E. was a freshman in college, his brother, C.E., discovered that the defendant was sending pornographic emails to M.E. The family addressed the matter with an elder at church, and it was not addressed again.

In 2008, M.E. was two years out of college when his mother was diagnosed with cancer. He had a casual relationship with the defendant, and M.E.'s mother and the defendant moved to Kentucky around 2010. M.E.'s mother passed away in 2011. M.E. went to visit the defendant in Kentucky by himself for about three days. M.E. stated that, "[o]ne of the deathbed wishes from my mom was to take care of my dad." While visiting the defendant, M.E. asked him for money to help him move. The defendant offered $100 and stated that he was not going to help anymore after

that. M.E. did not take his money and decided he wanted to make it on his own. M.E. made one last trip to Kentucky to see the defendant over the Fourth of July in 2012.

¶ 17    Thereafter, still in 2012, M.E. contacted the police. He stated that his mother's death influenced the timing of his contact with police because he felt there would not be a tragic consequence of him coming forward. He also stated there were three other incidents that prompted his contact with police. First, M.E. explained that he purchased a home with another family in Indiana. He was close friends with the family and they worked on youth ministry together. The family had a seven-year-old son. The defendant was introduced to the family when he visited from Kentucky and when M.E. and the family visited Kentucky. M.E. had a phone conversation with the defendant where the defendant asked if the parents of the seven-year-old boy would approve of the boy staying with the defendant for a week by himself.

¶ 18    Second, when M.E. was involved with youth ministry, he had another family that helped out and they had a son in high school. M.E. brought the family to Kentucky for a boating trip. The defendant asked if the son could stay with him for a week. Third, M.E. stated that the defendant had a neighbor with a disability in which he suffered brain damage from serving in the military. M.E. estimated that the neighbor was in his mid-20s. The defendant made a point to take care of the neighbor. M.E. stated that one time when the neighbor was intoxicated, the defendant put him to bed in the defendant's home. M.E. recalled another incident when he and his family visited the defendant in Kentucky and the defendant disappeared without informing anyone. When the defendant returned, he stated he was at his neighbor's house to help him. M.E. found this triggering as he also had a disability (he was deaf in one ear and had loss of hearing in the other).

¶ 19    After M.E. contacted the police in 2012, the case was not moving forward, so he contacted people in the defendant's life to make them aware of the situation to protect future victims. He

6

also informed the defendant that he filed a police report. M.E. stated that if the defendant wanted a relationship with him, he needed to go to counseling, have an accountability partner, and be in a support group. M.E. had not heard from the defendant since. Regarding the outcome of the case, M.E. stated that he originally only wanted the defendant to serve a maximum of six months in jail instead of prison because the defendant was having a hard time. He wanted to be compassionate. However, after M.E. received the defendant's PSI evaluation results, his preference changed. He felt that the defendant was victim blaming. Therefore, he had no preference on sentencing.

¶ 20    M.E. described the impact of the defendant's actions. He stated that he was led to believe that fathers touched their kids sexually and that it was okay even though it did not feel that way. He struggled with not wanting to have children because he did not want to touch them sexually. M.E. was embarrassed and ashamed and felt trapped as he could not talk about it with anyone else. His mother was emotionally unstable, and he feared that she would commit suicide. He felt that the weight of keeping the family together rested on him and being silent was the only thing he could do. M.E. believed that his loss of hearing and being male was a big part of why the defendant took advantage of him. He had dealt with anxiety, depression, panic attacks, anger, flashbacks, trouble sleeping, and suicidal thoughts as the result of the sexual abuse. M.E. has been in counseling and taking medication for his anxiety and depression. He struggles with trusting people in authority and being open with his own family. M.E. used to feel paranoid that people would find out about the sexual abuse, but since his mother's passing, he felt free to speak up. He felt the weight of responsibility in protecting other people from his father.

¶ 21    2. Gene Morgan

¶ 22    Gene Morgan testified that he lived in Kentucky and had known the defendant for about six years from church. Morgan stated that he would see the defendant every week at church but

7

they also passed out flyers together and held events for the community. The defendant played piano for the church. The defendant was there for Morgan when he had a heart attack and also when he broke both legs the next year. The defendant visited him several times in the nursing home, brought food to his home, and took care of his yard. When Morgan learned of the charges against the defendant, he was surprised because the defendant "lived his life as a Christian man as close to the Lord as anybody in our church." He stated that the defendant told him that he had done things with his son that should not have happened, was sorry for it, wished it never happened, would change it back if he could, and became withdrawn since the news came out. Morgan believed that it would be safe for the defendant to be alone with his grandchildren.

### 3. Jim Bryant

Jim Bryant testified that he had a weekend home across the street from the defendant in Kentucky. He had known the defendant since 2010. They would have conversations outside and shared some meals together. The defendant watched Bryant's lake home while he was not there. Bryant had given the defendant a key to his home, and the defendant had helped him on occasion. He had never seen the defendant involved in any inappropriate behavior or conduct with younger people. Bryant stated that he had a lot of family at the house and no one was ever uncomfortable. Since learning of the charges against the defendant, Bryant's opinion of the defendant had not changed. Bryant stated that it would be safe for the defendant to be alone with Bryant's children.

### 4. Louie Perez

Louie Perez testified that he lived close to the defendant in Kentucky. He had known the defendant for 30 years and first met him at church. Perez retired and had a house built in the area shortly after the defendant and his wife had their house built. He stated that he had two boys who grew up with the defendant's two boys. Sometime after the defendant's wife passed away, M.E.

called Perez and told him to be careful with his grandkids around the defendant because the defendant had abused him. Perez approached the defendant about it. The defendant admitted that something happened, cried, and was very saddened about it. Perez stated that the defendant was still his friend and that Perez was going to work towards forgiveness. He stated, "that's between him and his son," and he had no problems with the defendant at all. Perez noticed that the defendant had become withdrawn. He stated that he still allows his grandchildren to be around the defendant and socialize with him, but they are not at his house alone.

¶ 27                                5. The Defendant

¶ 28        The defendant testified he was 68 years old. He discussed that he was involved with his church. The defendant was diagnosed with diabetes in 2006 and said it was out of control because of stress. Specifically, his blood sugar ran high, and when he tried to get his blood sugar down, it goes too low. There were times when he has passed out. The defendant wore a device that monitors his blood sugar and communicates with his phone. He needs access to the internet to read the device. The defendant administers himself two injections of insulin, one in the morning and one at night, and three injections before he eats. He also takes pills for high blood pressure, high cholesterol, and acid reflux. The defendant sees a doctor every three months or as needed but has never been hospitalized for problems with his diabetes. He stated that he also has back problems and has difficulty sitting or lying down for a long time and receives injections in his spine.

¶ 29        The defendant recalled that M.E. went to stay with him after his wife passed away. He stated that they had a good time as they went out on the boat, went out to eat, watched movies, and played games. The defendant said things went bad when M.E. asked him for money for a down payment. He said he was not comfortable giving M.E. money to buy a house with another couple. M.E. visited him over the Fourth of July weekend in 2012, and then filed the police report.

9

¶ 30        In 2019, the defendant received a letter from a lawyer in Illinois stating that he was going to need legal services and that was how he became aware of the charges. He was advised to wait until he received a letter from the court. Three officers came to his home to arrest him. The defendant told them he was expecting a letter. The officers informed him that he was not going to get a letter and arrested him. The defendant stated the officers would not allow him to put socks on, and they cuffed his hands too tight and did nothing after his complaints. When he arrived at the detention center, he was put in a small cell and it hurt to bend his back. They kept him in a holding cell for five days where he slept on the floor and it was cold. The defendant stated when his charges were read aloud in court the other inmates became aware of the charges and threatened his life.

¶ 31        The defendant was surprised that the PSI and sex offender evaluation believed he did not accept responsibility or deflected responsibility even though he was rated low risk. He stated that he told the evaluator what he did to M.E. and how it happened. The defendant stated he was sorry and never should have done that as a parent and put his child through that. He also recalled the terms M.E. stated in order for them to have a relationship. However, the defendant did not know how to approach a counselor with the situation. He stated that he has no contact with anyone in his family, and he does not know why his sister will not contact him. The defendant stated he no longer went to church because they no longer wanted him there and that he was paranoid about going anywhere because everybody knows.

¶ 32        On cross-examination, the State asked the defendant if he recalled making certain statements that were contained within the PSI. Specifically, the defendant was asked why he committed the offense and he responded that he thought he was instructing M.E., they had an open relationship, M.E. was slow and not understanding, and he should not be punished for that. The

10

defendant did not remember saying that he should not be punished. He reiterated that he told the counselor that was how it started, as an instruction, then it became more sexual. The defendant disagreed that he said he was not taking responsibility. The State continued and read specific quotes from the defendant, such as M.E. was learning about his body, it dawned on him what M.E. wanted, it was upsetting that M.E. turned on him like this, he did not deserve to go to jail, he was not looking for people to molest, and he did not feel that he raped M.E. The defendant said that he never said the word "rape" but stated that he molested his son as rape would be intercourse.

¶ 33      The State continued with more statements made in the reports, such as the defendant admitted he touched M.E., showed M.E. his penis would get hard, and told M.E. things about masturbation. The defendant explained that M.E. "had a thing" where he liked the defendant to tickle his stomach, and he "must have come across his penis." Next thing he knew, M.E. ejaculated. The defendant agreed that he made these statements during the evaluations.

¶ 34                                          D. Closing Arguments

¶ 35      The State argued that the defendant's general attitude was the most important factor in the case. It stated that the defendant's statements in court and in the PSI can be summarized as self-pitying and victim blaming. He felt sorry for himself because his adult sons would not have contact with him because he sexually abused M.E. He expressed feeling sorry for himself because his church asked him not to attend, and he was uncomfortable with the circumstances surrounding his arrest. The State argued that the defendant never portrayed any sincere sympathy for M.E. nor did he ever express feeling genuinely sorry for what he did to M.E. Instead, the defendant continued to express anger at his sons. For instance, the State provided that the defendant blamed C.E. for people finding out about his pornography addiction. The PSI officer said that the defendant got angry on the phone when telling the officer about C.E. installing spyware on his computer to see

11

what he was doing. The State found this significant because this was when the defendant's sexual abuse of M.E. first came to light, which led the family to speak with an elder at their church.

¶ 36    The State also argued that the defendant continued to condescend and insult M.E. It pointed to M.E.'s testimony where he believed he was targeted because of his disability and because the defendant thought he was weak and vulnerable. The State pointed to the PSI where the defendant blamed M.E.'s wife for the criminal troubles because he thought that M.E.'s wife convinced him that this was the way to go. The defendant believed that M.E. must have had an outside influence to go to the police. The defendant also insulted M.E.'s intelligence by stating that he would not have been able to put together a statement that detailed without help. The State also argued that the defendant was surrounded by people who enable him and the court could not rely on them to protect others from the defendant. The State provided that a sentence of probation would seriously deprecate the seriousness of the offense, be inconsistent with the ends of justice, and not serve the goal of protecting the public from the defendant. It argued that the defendant could not be rehabilitated at this point because he still blamed M.E. for his own crimes. The defendant continued to explain that the sexual abuse started as a teaching lesson implying that he was a good father. The State noted the way the defendant phrased things, such as stating M.E. watched him masturbate, instead of stating that he masturbated in front of M.E. The State asked the court to consider the irreparable harm the defendant caused M.E. and that the sentence reflect the important goal to deter the defendant from committing a crime like this again. The State noted mitigating factors, such as the defendant's lack of criminal history and his health. The State requested that the court sentence the defendant to seven years' imprisonment.

¶ 37    The defense asked the court to sentence the defendant to probation with stringent conditions required of sex offender probation. Defense counsel noted that the defendant did not

12

have a criminal record and there had been a long period of time since any abuse occurred. Further, he was involved in church, helped others, and also had neighbors that trusted him despite his history. The defense agreed the defendant should be punished but that he was "essentially a lonely, pathetic, ill old man living by himself in the State of Kentucky with this dark thing in his past but nothing since that time." Defense counsel explained, because of his pathetic existence, he is already in something similar to a cell. Also, since the defendant would have to be on the sex offender registry, his freedoms will already be restricted. Last, the defense stated that the defendant's medical condition would put an undue burden on Illinois taxpayers.

¶ 38                                    E. Allocution

¶ 39        The defendant gave a statement in allocution. He spoke directly to M.E. and apologized for the abuse and stated that M.E. was not responsible for what happened. The defendant stated he had been stressed and wanted a relationship with his sons. He stated time has passed, and he learned a lot through what he did and asked the court to be lenient.

¶ 40                                    F. Sentence

¶ 41        The court stated it considered the PSI, evidence, arguments, statement of allocution, factors in aggravation and mitigation, the history and character of the defendant, and the circumstances and nature of the offense. It found that the defendant was not inclined to be responsible for what happened, and he felt sorry for himself. The court noted (1) the defendant blamed M.E.'s wife for the trouble he is currently in because she is a counselor, (2) the defendant stated he was teaching M.E., (3) the defendant suggested that children get over sexual abuse with limited impact to their lives, (4) the defendant's responses to a questionnaire suggested that he held many cognitive distortions regarding children and sexual behavior typically seen in men who abuse children, and (5) the evaluator noted that the defendant's risk for sexual re-offense was higher than what the

13

current risk assessment could accurately measure. The court stated that probation would deprecate the seriousness of the offense and would be inconsistent with the ends of justice. It sentenced the defendant to seven years' imprisonment followed by two years' mandatory supervised release.

¶ 42 The defendant filed a motion to reconsider the sentence, arguing that his sentence was excessive due to his lack of criminal history, the time that had elapsed since the offense without any wrongful conduct in the interim, the sex offender evaluation categorizing him as very low risk, his pretrial behavior and compliance, and his current life circumstances. The court denied the motion to reconsider, stating that it had considered all of the factors raised in the motion and sentenced the defendant accordingly. The defendant appeals.

¶ 43                                    II. ANALYSIS

¶ 44 The sole issue the defendant raises on appeal is whether the circuit court abused its discretion in sentencing him to seven years' imprisonment. This court has the power to reduce a sentence pursuant to Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967). However, our supreme court has admonished that this power should only be exercised cautiously and sparingly. *People v. Jones*, 168 Ill. 2d 367, 378 (1995). As such, we will not alter a defendant's sentence absent an abuse of discretion by the circuit court. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). A sentence within statutory limits will be deemed excessive, and the result of an abuse of discretion, where the sentence is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *Id.* at 210.

¶ 45 The sentencing range for a particular offense is dictated by statute. Within that statutory range, the court is charged with imposing a sentence based on the particular facts of the case, which includes the nature of the offense and the character of the defendant. *People v. Fern*, 189 Ill. 2d 48, 55 (1999). The circuit court considers other factors such as the defendant's credibility,

14

demeanor, general moral character, mentality, social environment, habits, and age. *Id.* at 53. The circuit court is afforded discretion in imposing a sentence and its sentencing decisions are entitled to great deference. *People v. Murray*, 2020 IL App (3d) 180759, ¶ 26. This deference acknowledges that the circuit court observes the defendant and proceedings, which affords it a far better opportunity to consider the relevant factors. *Fern*, 189 Ill. 2d at 53. Therefore, we cannot substitute our judgment for that of the circuit court merely because we would have weighed the factors differently. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). Although the circuit court has wide latitude in fashioning a sentence within the statutory limits, the court cannot consider incompetent evidence, improper aggravating factors, or ignore pertinent mitigating factors. *People v. Hernandez*, 204 Ill. App. 3d 732, 740 (1990).

¶ 46    In the case before us, the defendant makes numerous arguments to support his contention that the court failed to give proper weight to critical factors in mitigation: (1) he had no criminal history or claims of abuse since the commission of this offense; (2) his likelihood of reoffending is negligible as (a) the abuse was confined to a specific period of time, (b) it was directed only at his son, and (c) he will be a registered sex offender which eliminates any potential contact with children of the same age that M.E. was at the time of offense; (3) he is advanced in years and has significant health problems; (4) he would comply with the terms of probation as he complied with the conditions of pretrial release; (5) imprisonment would endanger his medical condition; (6) he had a support system to help with his rehabilitation; (7) the sex offender evaluation concluded that he was at low risk to reoffend and the court did not give it enough weight when it stated that the sentence was necessary to protect the public; (8) the court should have considered the attitude and ulterior motive of M.E. (stating that M.E. went to the police after the defendant denied his request for financial assistance to purchase a home and M.E. initially agreed that probation was a

15

compassionate sentence but changed his mind); and (9) the abuse occurred 20 years ago and he has since led a law abiding life and continued a relationship with M.E. after the abuse.

¶ 47    For the following reasons, we find that the circuit court did not abuse its discretion when it sentenced the defendant to a term of seven years' imprisonment. First, Class 2 felonies are subject to a term of imprisonment of not less than three years and not more than seven years. 730 ILCS 5/5-4.5-35(a) (West 1996). Although the defendant received the maximum sentence allowed, we presume that it was proper because it falls within the permissible statutory range. *People v. Brown*, 2018 IL App (1st) 160924, ¶ 10. Second, the defendant makes no allegation that the court considered incompetent evidence, considered improper aggravating factors, or ignored pertinent mitigating factors. *Hernandez*, 204 Ill. App. 3d at 740. Instead, he takes issue with the apparent weight the court gave to the pertinent factors and argues that his sentence is at great variance with the spirit and purpose of the law and manifestly disproportionate to the nature of the offense.

¶ 48    The record before us establishes that the court was aware of and considered the factors the defendant argues as they were part of the record, discussed at the sentencing hearing, and discussed at the hearing on the defendant's motion to reconsider the sentence. The record also demonstrates that the court fashioned a sentence that was appropriate based on the circumstances of the case, including the nature of the offense and the defendant's character. See *Fern*, 189 Ill. 2d at 55.

¶ 49    The court made specific mention of the defendant's behavior since his arrest, such as blaming M.E.'s wife for encouraging M.E. to come forward, his insistence that he was teaching M.E. about his body, feeling sorry for himself, and his failure to take responsibility for the abuse he perpetrated against M.E. We also make note of the defendant's explanation of events that placed blame on M.E., such as stating M.E. watched him masturbate, instead of stating that he masturbated in front of M.E. Although there was no indication that the defendant had committed

16

any offense since his abuse of M.E., his responses during the evaluations indicated that he held many cognitive distortions regarding children and sexual behavior seen in men who abuse children. The sex offender evaluation also provided that, although the defendant's risk of reoffending was rated as low, it was likely that the defendant underreported his sexual attraction and/or interest in minors either on a historic or current basis when considering his past conduct.

¶ 50     The record also contained factors in mitigation that the defendant argues on appeal, such as the defendant's health, his lack of any other criminal conduct, and his compliance with pretrial release. However, the weight attributed to the factors in aggravation and mitigation depends on the particular circumstances presented, and we emphasize that the balance to be struck among aggravating and mitigating factors is a matter of judicial discretion. *Hernandez*, 204 Ill. App. 3d at 740. For the reasons explained, we fail to find that the court abused its discretion when it found that the factors in totality favored a sentence of seven years' imprisonment, and we cannot say that the sentence is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense.

¶ 51                                   III. CONCLUSION

¶ 52     For the foregoing reasons, the judgment of the circuit court of Tazewell County is affirmed.

¶ 53     Affirmed.