2022 IL App (2d) 200385-U
No. 2-20-0385
Order filed March 25, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-2328 |
| SERGIO L. PUENTES, | ) ) | Honorable Robert Randall Wilt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices McLaren and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The evidence was sufficient to sustain defendant's conviction for home invasion, and the trial court did not abuse its discretion in sentencing defendant to 20 years' imprisonment on that conviction.  Affirmed.

¶ 2    After a jury trial, defendant, Sergio L. Puentes, was convicted of two counts of home invasion (720 ILCS 5/19-6(a)(2) (West 2020)), aggravated domestic battery (720 ILCS 5/12-3.3 (West 2020)), and aggravated battery (720 ILCS 5/12-3.05(a)(1) (West 2020)).  He was sentenced to 20 years' imprisonment for one home invasion conviction, to be served consecutive to 2 years' imprisonment for the aggravated battery conviction.  On appeal, he (1) challenges the sufficiency

of the evidence supporting his home invasion conviction, arguing that the State failed to prove that he knew or had reason to know at the time he entered his former girlfriend's residence that any person was inside the home; and (2) argues that his 20-year sentence for home invasion is excessive given the nature of the offense and his living the first 36 years of his life as a good citizen. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On December 13, 2017, defendant was charged with two counts of home invasion (counts I and II), attempt first degree murder (counts III and IV) (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2020)), aggravated domestic battery (count V) (720 ILCS 5/12-3.3 (West 2020)), and aggravated battery (count VI) (720 ILCS 5/12-3.05(a)(1) (West 2020)). In the home invasion count of which he was ultimately convicted and sentenced, the State alleged that defendant, without authority and when he knew or had reason to know that one or more persons were present, knowingly entered Kristina Braden's dwelling place and hit Braden, who had a physical disability, with furniture, causing a laceration requiring staples. In the aggravated battery charge on which defendant was ultimately convicted and sentenced, the State alleged that defendant knowingly committed battery against Jeffrey Keister by striking Keister with a piece of furniture, causing a laceration.

¶ 5                                       A. Trial

¶ 6     During opening statements, defense counsel argued that Braden and Keister were injured on the day at issue while in Braden's home and that defendant was the only other person inside the home.

¶ 7                                 *1. State's Case*

¶ 8                              a. Deputy Deven Highland

¶ 9        The jury trial commenced on October 2, 2018. Winnebago County Sheriff's Deputy Deven Highland testified that, on September 16, 2017, at about 9:49 p.m., he and Deputy Wagner responded to Braden's home at 1280 Fisher Road in South Beloit. Upon arrival, he observed a motorcycle in the driveway and saw defendant trying to drag Braden toward it. Defendant was hitting Braden and trying to put her on the motorcycle. Braden cried out for help. Defendant got on the motorcycle, and Highland and Wagner instructed him to get off it. Defendant did not comply, and the deputies removed him from the motorcycle. Braden ran back into the residence. Defendant stated that he was going to kill Braden because she was cheating on him.

¶ 10       Deputy Highland entered the residence and saw Braden on the kitchen floor, leaning against cabinets. Her shirt was blood-soaked, and she appeared to be in distress. A male was inside a bathroom with a blood-soaked towel on his head. After speaking to them, Highland obtained a statement from a neighbor.

¶ 11       The man and Braden were taken to the hospital, and the deputies took defendant to the hospital. At the hospital, defendant stated that the deputies did not know what it was like to catch one's girlfriend cheating and that he was going to kill the man. Braden, defendant stated, broke his heart because she was cheating on him. Once defendant was medically cleared, the deputies transported him to the detective bureau for an interview, during which defendant stated that Highland did not "know what it was like to catch your girl cheating on you, and that he had to beat the bitch."

¶ 12       Upon being shown a photograph of the residence, Deputy Highland testified that the photograph accurately depicted that the front porch lights were off that evening. On cross-examination, Highland testified that his report did not state that, at the hospital, defendant stated that he was going to kill anyone.

¶ 13                                    b. Kristina Braden

¶ 14    Braden testified that she has multiple sclerosis.  She was diagnosed in July 2010.  Braden started dating defendant in February 2011, and he moved into her home in August 2011.  They dated for three years.  In June 2014, Braden told defendant that he had to prepare to move out because she could not handle the relationship anymore.  Defendant moved out in October 2014.  He continued to have a key to her house for about six months because he worked and had a lot of items in her basement and garage.  After the six months (*i.e.*, around the beginning of 2015), Braden changed the locks.  Afterward, defendant did not have a key to her home, but had items in the basement and garage.

¶ 15    Between the beginning of 2015 and July 2017, Braden remained friends with defendant and, on and off, they were more than friends and slept together.  He would stay a night or two in her guest room.

¶ 16    In July 2017, Braden informed defendant that he had to remove the items because she was remodeling, could not store them anymore, and that she would get rid of anything he did not remove.  Defendant rented a truck and removed almost all his belongings.  On September 10, 2017, Braden told defendant that she wanted to pursue a relationship with someone else and that she and defendant "needed to just stop sleeping together and go back to being just friends."  Defendant was "hurt but calm, and he said he didn't want to be friends with me."  He also stated that he wanted to get his belongings out of the house before Braden brought the man to her house.  When Braden told him that he could take the items at that time, defendant replied that he just wanted to leave and left.  (The items in the basement consisted of glass desktops and a gun safe.  In the garage, defendant had stored roofing supplies, old nails, and hoes.)

¶ 17    Several days later (on Thursday), Braden texted defendant, stating that the new man was coming over on Saturday and that, if defendant wanted to remove his belongings before he arrived, he would have to remove them before Saturday. Defendant did not respond. Late Saturday morning, defendant called Braden. He was angry. Defendant stated that he loved Braden and hoped they could have been together forever, but he also stated that she had "some real balls bringing that fucking guy around here." He asked for the man's name, but Braden did not tell him because she wanted to protect the man. Defendant asked what time the man was coming over, and Braden replied at 5 p.m. and that defendant would have to remove the items before then. "And he never said anything about getting his stuff out. Just that he was mad, and he then—we were just talking in circles, so I ended the call."

¶ 18    Jeffrey Keister arrived at Braden's house at 5 p.m. They had a glass of wine and left to go to dinner in Rockton. On their way back to Braden's house, Braden's next-door neighbor, Jackie Dionysius, whose husband is defendant's uncle, texted her to ask if she was home yet. After Braden informed her that she would be home in three minutes, Dionysius suggested that Keister park his truck in Dionysius's driveway. Braden called Dionysius, who informed her that she saw defendant at Braden's home after Braden left. He was banging on doors, yelling, and looking into windows.

¶ 19    When Braden and Keister arrived at Braden's home, they parked the truck in Dionysius's driveway, spoke to Dionysius's husband, Greg, briefly, and went into Braden's home and locked the doors and closed the drapes and blinds. Then, they went to her deck to smoke. While on the deck, Braden and Keister heard a motorcycle that Braden recognized as defendant's motorcycle. At that point, they went into the house, locked the door, and Braden went to the back door to wait for defendant to knock on it. Keister stayed in the den. Defendant did not come to the back door

at first, so Braden went to the den and told Keister that defendant had not come to the back door. Keister informed her that defendant "had been wiggling the door handle to the deck door, so he and I went into the living room and sat on the couch[.]"

¶ 20    Dionysius called Braden, stating that defendant was at Braden's front door, unscrewing light bulbs. "He is going to do something. I'm calling 911 right now." Braden heard a "loud thud" by the deck door and then heard a crash. She was still in the living room at this time and could not see the deck door. (Defendant entered through the French doors from the deck into the den.) Defendant walked into the living room from the den, Braden stood and asked him if he was crazy and "[w]hat the fuck are you doing here?", and defendant pushed her down on the floor. He started punching Keister in the face and head while Keister was on the couch. Braden grabbed a child-sized wooden rocking chair and hit defendant with it. Defendant, to Keister, "was just calmly saying I'll kill you, I'm going to kill you[.]" Braden kept hitting defendant with the chair and repeatedly told him to stop.

¶ 21    Keister rose from the couch and went to the front door. Defendant was still beating him, but then turned around and pushed Braden. She fell on the couch, got up, and defendant grabbed her end table by the legs, raised it, and "smashed it on my head." He then returned to beating Keister. Braden went to the ground and could not hear out of her left ear. Her head was "foggy," and she was dizzy. She then stood. Braden believed that defendant was going to kill her and Keister, so she ran to the kitchen, grabbed the house phone, and called 911. She did not want to leave Keister alone with defendant because defendant might beat him to death.

¶ 22    Defendant walked into the kitchen, walked toward a block of knives, turned to Braden and smiled, grabbed the knife sharpening rod, and waived it at Braden while smiling. He then put

down the rod and grabbed the biggest knife in the block. Braden was still speaking to the 911 operator at this time and believed that she told the operator that defendant had a knife.

¶ 23 Braden saw that Keister had gone to a bathroom. Defendant told Braden to tell the operator that everything was fine, but she said that everything was not fine. Defendant hung up her phone, but the operator called back once or twice. Braden hit "answer," believing the call would be recorded but did not say anything. She still held the phone. Braden went out the back door, but defendant grabbed or chased her. (She was "foggy" on some details.) Defendant grabbed her by her right shoulder and sleeve and dragged her to his motorcycle.

¶ 24 At the motorcycle, he smiled again and told her to get on his bike. Braden tried to stall in the hope that paramedics would arrive, informing defendant that he had hit her on the head and that she was dizzy and lightheaded and could not get on the bike. Defendant replied, "do you want to die tonight, bitch? You ruined my fucking life. If you don't get on my bike, I'm going to kill you right now, so get on my motherfucking bike." Braden stood in front of defendant, who stood in front of his motorcycle. Defendant's left hand held Braden, and his right hand held the knife. She then felt "something" on her left shoulder, thinking he tried to stab her but just hit his hand. Braden saw a vehicle driving by and she screamed. It was the deputies, and, as they pointed their weapons at defendant, she lunged away from defendant, threw her hands up, dropped the phone, and yelled that defendant had a knife.

¶ 25 After defendant was handcuffed, Braden went into the house to find Keister. The deputies provided her with aid until the paramedics arrived and took her to the hospital. At the hospital, personnel closed her stab wound with stiches, put 12 staples in her scalp, and performed a chest X ray and CT scan of her head.

¶ 26    Braden further testified that she ordinarily kept on her front porch lights "24/7." She testified that a photograph taken of her house on the night of the incident showed that the front porch lights were off.

¶ 27    On cross-examination, Braden testified that she did not include in her statement to police that defendant said he was going to kill Keister while he punched him after he entered her house. Further, all she told police was that defendant grabbed a knife. She did not state that he grabbed a honing rod and smiled at her.

¶ 28                          c. Jeffrey Keister

¶ 29    Keister testified that Braden is his girlfriend and that they started talking around September 16, 2017. On September 16, 2017, they planned for him to go to her home and then go out to dinner. Keister arrived at Braden's house around 5 p.m. He drove there in his Chevy Silverado pickup. Braden showed him around the house, and they talked. She also showed him the house projects she was working on. They went to dinner in Rockton around dusk.

¶ 30    After dinner, Keister drove them home. When they arrived at Braden's house, Keister noted that there were no lights on around the exterior of the house. He initially parked his truck in Braden's driveway but then moved it to a neighbor's driveway. Once inside Braden's house, Keister helped Braden put up curtains and blinds on some windows, and he locked the doors. They got a glass of wine and went out onto the deck, which is off a side living room. Braden noticed a motorcycle coming down the road toward her home, and she stopped talking and said that they needed to go inside. Once inside, they locked the doors. Keister sat on the couch in the room next to the one off the deck. Braden also sat on the couch. There was a lamp on near the couch.

¶ 31    Keister heard noises out on the deck. Someone was moving the patio furniture. Braden stood, and Keister heard a loud crash and saw the patio door get kicked in and defendant enter the

home. Defendant pushed down Braden and came toward Keister, who was still on the couch. Defendant is bigger than Braden and Keister. Defendant approached Keister and said "who the 'F' are you, and he punched me in the [right cheek]" with a closed fist. Keister was knocked to the floor by the couch. Defendant attacked Braden with a piece of furniture—a small four-legged wooden table. Braden collapsed on the floor. Keister stood and tried to stop defendant from attacking Braden, but defendant "shoved" him backwards. Keister lost his balance and fell on top of a wooden table, which collapsed.

¶ 32　Defendant grabbed one of the broken table legs and started beating Keister, who was on the floor, on the head with it. The leg had sharp wooden screws sticking out of it. Defendant struck Keister with the leg about 6 or 10 times. "He stood over me and told me he was going to kill me." Keister was terrified and repeatedly yelled at defendant to stop. He turned on his side and tried to block the wooden leg with his feet and hand. Defendant hit Keister's arm "so many times that I couldn't move it. I thought it was either broken or dislocated."

¶ 33　Keister saw Braden standing and yelled at her to get help. She left. Eventually, defendant stopped hitting Keister, dropped the table leg on the floor, and left the room in the same direction as Braden, *i.e.*, toward the kitchen. Keister picked up the table leg and stumbled to the bathroom, where he barricaded himself. He felt very lightheaded and disoriented and in shock, and he was "bleeding profusely." Keister took a bath towel and put it on his head to help control the bleeding. He remained in the bathroom until police arrived.

¶ 34　He was transported to the hospital. The laceration to his head required 12 staples, and he was not able to use his arm for three months until his bruised shoulder healed.

¶ 35　　　　　　　　　　　　d. Brandon Nierhoff

¶ 36    Brandon Nierhoff, a nurse practitioner, testified that Keister came into triage, reported that he had been hit with a furniture leg, and received staples to his head.

¶ 37                              e. Jacqueline (Jackie) Dionysius

¶ 38    Dionysius, Braden's next-door neighbor, testified that she knew Braden and defendant and that defendant is her husband's nephew. On September 16, 2017, between 9 and 10 p.m. (*i.e.*, during his second visit), Dionysius saw defendant arrive at Braden's house on his motorcycle, which she had heard before. She saw defendant unscrewing light bulbs (to turn off the lights) on the front porch and then walking to the back of the garage. He then tried to get into Braden's house.

¶ 39    Dionysius knew Braden was home because, earlier that day, Dionysius's husband saw defendant at Braden's house and walked over and asked him to leave because Braden was not home. While Braden was gone, Dionysius called her to tell her that defendant had been at the house.

¶ 40    During defendant's second visit, Dionysius called Braden to let her know that defendant was at her house. She believed defendant "was going to do something" and told her that she was going to call 911. Dionysius saw defendant try to kick in the back door, and, when he could not kick in that door, he walked back toward the patio doors on the deck, which were out of her sight. Dionysius continued to look out her window and could see the altercation (but not faces) through the kitchen window. She also saw defendant drag Braden out of the back door and try to force her onto his motorcycle. Dionysius had opened her window and heard Braden yelling for help. The police arrived.

¶ 41    Keister's pickup truck was parked on Dionysius's driveway. It was not blocked by anything, but it was dark out.

¶ 42                                   e. Deputy Dan Freedlund

¶ 43     Winnebago Sheriff's Deputy Dan Freedlund processed the evidence and took photographs at the scene.  He testified that the door from the porch area into the residence (*i.e.*, the west side door) was damaged.  It appeared to have been forced open, and he located a foot impression on the door that he photographed.

¶ 44     Freedlund went to the hospital and photographed Braden and Keister and collected their clothes.  Later, he photographed defendant and his clothes.  He also recovered the knife and the wooden furniture leg.

¶ 45     Deputy Freedlund testified that he heard defendant say at the detective bureau that "you would not understand what it's like to find your girl cheating with another guy, and I had to beat that bitch."

¶ 46     Following the testimony of Scott Varney, a paramedic who treated Braden, the State rested.

¶ 47                                   *2. Defendant's Case*

¶ 48     Defendant testified that he had been in a romantic relationship with Braden beginning in 2012 or 2013 and that it ended sometime in 2017.  During the summer of 2017, defendant stayed at Braden's residence most of the time.  Defendant drove a "semi" for a living and, when he was not on the road, he stayed at Braden's house every day.

¶ 49     In September 2017, Braden had a conversation with defendant about not seeing each other anymore.  It was a shock to defendant because Braden had never discussed it before.  She did not give him a reason why she did not want to be in a relationship with him.  Defendant felt "pretty crushed.  I loved her a lot, you know, my whole life was her."

¶ 50     According to defendant, most of his possessions were at Braden's house, including clothes, hats, and tools.  He asked to go to the house to retrieve his belongings, but they did not set a date.

¶ 51    On September 16, 2017, defendant went to Braden's house at about 7 or 8 p.m. to retrieve his belongings and to finish speaking with her about "what was going on, what was going to happen." Prior to going to her house, he had not had any communication with Braden that day. When defendant arrived at the residence, he went to the back door (the door he usually used), knocked, and waited for 10 minutes. Then, he left. He rode his motorcycle and filled it up with gas, "kind of just killing time."

¶ 52    Defendant returned to Braden's house about one or two hours later. There, he saw that it was dark, *i.e.*, there were no lights on. He parked his motorcycle in the driveway and walked to the back door. He knocked and checked if the door was unlocked. Defendant also walked to the front door and knocked on it. He felt "frustrated" and "upset" about the relationship.

¶ 53    Defendant returned to the back door and knocked harder on it. He was at Braden's house because he wanted to retrieve some of his things that he needed, including clothing for the next few days. He was planning on packing up a backpack and taking it with him, though he did not bring a backpack with him. Defendant next went to the side to check if that door was open. It was not. He sat and thought about what was going on, and that is when he decided to kick in the door.

¶ 54    He kicked in the door because he wanted to just get his "stuff and leave and never come back" and "just screw everything else and just leave." Defendant testified that he did not believe that anyone was home. "I mean, I beat on the door pretty hard and waited around for quite a while." It looked like all of the lights were off, and the curtains were closed.

¶ 55    After he kicked in the door, defendant entered the house (*i.e.*, the living room) and saw Keister standing and Braden sitting. He had never seen Keister before that day. Defendant was "shocked" because no one had answered, "so I didn't think anybody would even be there." Once he entered, Keister stated, "what are you doing" and came toward defendant. Defendant pushed

him back "pretty hard," and Keister fell, got back up, and they tripped over each other onto the floor, fighting. Defendant punched Keister with his fist. He did not have any weapons and did not enter the house with any weapons. While defendant and Keister were fighting on the floor, defendant felt something hit him from behind. After the second or third time being hit, defendant grabbed an end table and swung it around, hitting Braden.

¶ 56    When he realized that he had hit Braden, defendant "freaked out" and "froze." Keister kicked him in the stomach, and they fought. Defendant hit Keister in his legs and back with the table leg, which he grabbed from Keister. Defendant testified that he hit Keister with the table leg "a couple" of times in the legs. He was "pretty pissed. You know, this guy, he is going in on me, so yeah, I just wanted to, you know, get the fight over with."

¶ 57    Eventually, Keister said that he had enough ("he said okay, I'm done"), and the fight ended. Defendant went to the kitchen to look for Braden "because I hit her pretty hard with that table." In the kitchen, defendant saw Braden speaking on the phone. He stood there for a minute. Defendant denied taking possession of a weapon. He wanted to see the extent of Braden's wound, but he saw a "big knife" in her hand and he tried to make his way out the door. She swung the knife at him, defendant caught it and her hand, and they ended up going outside the door. Defendant tried to get the knife out of Braden' hand, wrestling with it and trying to bend her arm behind her (defendant faced her) so that she would release it. Eventually, Braden released the knife, it hit the ground, and defendant continued to hold her arm. The police arrived, and defendant raised his hands when instructed to do so.

¶ 58    Defendant denied that he threatened to kill Braden or Keister during the altercation. He was angry that day. His intent when he went to Braden's house was to retrieve a few things and

leave the rest of his belongings. He did not want to harm anyone and did not think that anyone was home.

¶ 59    On cross-examination, defendant denied that he told Braden that he did not want her to date anyone else. He also denied speaking to Braden that morning on the phone. Defendant was killing time so that he could go back when Braden was home. When he returned to the house, he was upset and decided to kick in the door.

¶ 60    When he hit Braden with the end table, Keister was on the floor on his back and under defendant, kicking defendant in the stomach with his feet. The defense rested.

¶ 61                          B. Verdict and Subsequent Proceedings

¶ 62    The jury found defendant guilty of three counts of home invasion, aggravated domestic battery (against Braden), and aggravated battery and found that Braden was physically disabled at the time of the offenses. It found him not guilty of two counts of attempt first degree murder. The court entered judgments of conviction on counts I (home invasion), II (home invasion), V (aggravated domestic battery), and VI (aggravated battery). It also entered the enhancing factor as to counts I and V that Braden was disabled.

¶ 63    On January 2, 2019, the trial court granted defendant's motion to represent himself, and, on September 25, 2019, a hearing was held on defendant's second amended motion for a new trial. The court denied the motion. Defendant, again represented by counsel, moved to reconsider, and the court denied the motion on January 9, 2020.

¶ 64    On February 7, 2020, the sentencing hearing commenced. Prior to sentencing, the court merged convictions, specifically, it merged count II (home invasion-Keister) into count I (home invasion-Braden) and count V (aggravated domestic battery-Braden) into count I. Because the remaining home invasion conviction involved Braden, the court did not merge count VI

(aggravated battery-Keister) into count I. Thus, defendant was sentenced on count I (home invasion-Braden) and count VI (aggravated battery-Keister). The court found that consecutive sentencing was mandatory for counts I and VI (730 ILCS 5/5-8-4 (West 2020)) because count I involved severe bodily injury.

¶ 65 Braden read her victim impact statement, stating that, for weeks, she had diminished hearing out of her left ear after defendant smashed the end table on her head. Her head wound, which required 12 staples, bled for days. Crying as a result of the incident triggered muscle spasms related to her multiple sclerosis. Her concussion caused dizziness, nausea, fatigue, and difficulty concentrating, which lingered for months. Braden also experienced nightmares after the incident.

¶ 66 Braden experienced her first multiple sclerosis attack in July 2010 and her second in August 2011 (while living with defendant). In August 2012, she was declared disabled, stopped working as a nurse, and began receiving social security disability benefits (upon which she supports herself and her 20-year-old son). The incident adversely impacted her physical therapy for multiple sclerosis.

¶ 67 Keister's victim impact statement was admitted into evidence. He stated that he sustained severe injuries to his head, right arm, shoulder, and hand and that he was unable to use his right arm for months. Keister recovered from the physical injuries, but psychological issues resulting from the incident persisted. He stated that the incident scarred him for life.

¶ 68 Amy Cash, defendant's mother, testified for defendant that the crimes were out of character and that defendant assisted her with various tasks. She was not familiar with charges pending against defendant in Wisconsin. Prior to the incident, defendant was employed as a roofer and had several employees.

¶ 69    Defendant provided a statement in allocution, apologizing and asserting that, while incarcerated, he found renewed faith in God.

¶ 70    The presentence investigation report (PSI) reflected that defendant was 38 years old, had no juvenile record, and had a limited criminal record comprised primarily of petty offenses, traffic violations, cannabis-related cases, and a court supervision for possession of drug paraphernalia. Defendant had two batches of pending Wisconsin felony cases at the time of the sentencing hearing.   He was regularly employed prior to his incarceration, and he had some history of substance abuse and mental health issues.

¶ 71    The State sought a sentence on the home invasion conviction in excess of 30 years' imprisonment, and defense counsel argued that six years was appropriate and that two years was appropriate for count VI.

¶ 72    The court sentenced defendant to 20 years' imprisonment (to be served at 85%) for count I (home invasion-Braden) (sentencing range 6 to 60 years) to be served consecutive to 2 years' imprisonment—the minimum sentence—for count VI (aggravated battery-Keister).  The trial court noted that it had considered the PSI, the applicable sentencing ranges, the cost of incarceration, the witness testimony, victim impact statements, and the statutory factors in aggravation and mitigation.  It also considered the fact that defendant stabbed Braden with a knife (which was over and above the conduct that served as the basis for the home invasion count), the injuries to Keister, and the psychological harm to Braden.  The court found that defendant was eligible for extended term sentencing because Braden suffered from multiple sclerosis.  However, the court determined that it was not appropriate to impose it, because of the mitigation evidence.

¶ 73    The court noted that the case was "egregious" because defendant planned the attack.  He came to the house "earlier.  They weren't there.  A neighbor saw him unscrewing the light bulbs

outside the house. That's pretty nefarious from my perspective. And it was done for a reason, and it wasn't a good reason. He was planning on coming back." The unscrewing of the bulbs, the court found, was "a huge red flag." Referencing defendant's comment that he had to beat "that bitch," the court determined that this reflected that defendant continued to be a danger to Braden and any other person with whom he believed she had a relationship. "If they wrong him in any way, shape, or form, if he feels that they're being unfaithful to him, it indicates he believes he has a right to attack them." The court found that defendant was likely to commit crimes again. Defendant's conduct threatened serious bodily harm ("it goes beyond what he did," referencing defendant's statement that he wanted to kill the victims and his stabbing of Braden). The court found that more than the minimum sentence was warranted.

¶ 74    In mitigation, the court found that defendant had a minimal criminal record, a positive employment history, and he was very helpful to his mother. The court also determined that "a huge factor in mitigation" was that defendant had found religion while in custody. Defendant also had a support system available upon release.

¶ 75    Beginning in 2016, defendant's life, the court found, took a turn for the worse. Defendant "jumped bail" on several Wisconsin charges—including possession of "a very large amount of cannabis" with intent to deliver it within a school zone, possession of illegal prescription drugs, substantial battery, and domestic disorderly conduct. This undercut, the court determined, defendant's mother's testimony that the incident at issue here was out of character for defendant.

¶ 76    Defendant, on March 10, 2020, moved to reconsider the sentence, and the court denied the motion on July 8, 2020. Defendant appeals.

¶ 77                                II. ANALYSIS

¶ 78                          A. Sufficiency of the Evidence

¶ 79    Defendant argues first that the evidence on the knowledge element of home invasion was insufficient to sustain his conviction on that charge.  He contends that the State failed to prove that he entered Braden's home when he knew or had reason to know that one or more persons were in the house.  For the following reasons, we reject defendant's argument.

¶ 80    "Where a criminal conviction is challenged based on insufficient evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime."  *People v. Brown*, 2013 IL 114196, ¶ 48.  That standard of review recognizes the responsibility of the trier of fact to resolve any conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the evidence.  *Id.*  Accordingly, "a reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses."  *Id.*  " 'The mere existence of conflicting evidence at trial does not require a reviewing court to reverse a conviction.' "  *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67 (quoting *People v. Goodar*, 243 Ill. App. 3d 353, 357 (1993)).  " 'It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt.' "  *Id.* (quoting *People v. McCarter*, 2011 IL App (1st) 092864, ¶ 22).  We will not reverse a conviction unless the evidence is so improbable, unreasonable, or unsatisfactory as to justify a reasonable doubt of [the] defendant's guilt.  *People v. Rowell*, 229 Ill. 2d 82, 98 (2008).

¶ 81    "A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present *** and *** [i]ntentionally causes any injury *** to any person or persons within the dwelling place[.]"  720 ILCS 5/19-6(a)(2) (West

2020). Relevant considerations regarding whether the defendant knew or had reason to know that a person was present in the home include the time the entry took place, the defendant's attire, whether the defendant rang the front doorbell, and the time of the defendant's arrival at the house. *People v. Price*, 2011 IL App (4th) 100311, ¶¶ 18-20.

¶ 82 Defendant notes that he was outside Braden's home during his first visit while Braden and Keister were out to dinner. He testified that he knocked on the door, stayed 10 minutes, and left. Keister's truck was not there. Defendant contends that he had no reason to believe that anyone was home at this time.

¶ 83 Further, defendant contends that he had no reason to believe that anyone was home when he returned later for his second visit. While Braden and Keister were coming home from dinner, Dionysius invited Braden to park Keister's truck in her driveway because, according to Dionysius, defendant had been at her house while Braden was gone. Obviously, defendant contends, Braden and Keister left Keister's truck at Dionysius's house to prevent defendant from knowing that they had returned. When defendant returned, he would not have had a reason to know, he argues, that Braden had returned home, because the truck was not there. Also, Braden and Keister had closed the window treatments to prevent him from determining that they were home. Defendant also notes that, after he tried to open the door, Keister whispered to Braden that defendant was trying to enter the house. Keister would have no reason to whisper, defendant suggests, unless he and Braden were trying to conceal from him the fact that they were inside the house. Further, although Keister testified that there was a light on by the couch, he also told the police that the lights were off at the house. Regardless of whether the light by the couch was on or off, defendant argues, that information was meaningless without testimony that the light was turned on after Braden and Keister arrived home the second time.

¶ 84    Defendant also asserts that it makes sense that he entered the house with the belief that nobody was present. Braden testified that defendant had numerous items at her house and that she had told him that the items had to be removed before her new boyfriend arrived or she would get rid of his belongings. Defendant testified that he did not think anyone was home because the lights were off and the curtains were closed and that he just planned to get his belongings. Thus, defendant reasons, he had a reason to enter the house apart from jealousy.

¶ 85    Addressing the fact that the window treatments were not drawn when defendant arrived the first time but were drawn the second time he sent to the home and that someone could surmise that someone was home, defendant contends that this fact merely proves that someone was there between his visits. Also, he argues that there was no good evidence that he would have noticed the lack of window treatments on his first visit. He testified that the first time he arrived he knocked on the back door, waited for 10 minutes, and left. Dionysius, per Braden, stated that defendant was banging on doors, yelling, and looking in the windows. However, Dionysius herself did not see defendant looking in the windows. Dionysius's husband saw defendant there the first time, and he did not testify at trial. Further, defendant notes, Dionysius did not testify that her husband stated that he saw defendant looking into Braden's windows. Thus, the only evidence, defendant argues, that defendant looked in the windows is uncorroborated, inadmissible double hearsay that Dionysius told Braden what her husband purportedly told Dionysius what he had seen.

¶ 86    Defendant also contends that his alleged unscrewing of the light bulbs does not show that knew or should have known that anyone was inside the residence. He claimed that he entered to retrieve his possessions. If he believed no one was home, he would have more reason to unscrew the bulbs, he argues, because that would help prevent neighbors from witnessing him enter with no witnesses inside. Had he believed people were present, unscrewing the bulbs, he contends,

would not prevent Braden or Keister from identifying him inside. Defendant also notes that he was not masked when he entered the residence, and he took no other steps to conceal his identity. It makes more sense, he suggests, that the bulbs were loosened to prevent witnesses from seeing him enter an empty residence than to prevent witnesses from seeing him enter a residence with two witnesses inside, one of whom knew him well.

¶ 87 We conclude that the evidence was sufficient to sustain defendant's home invasion conviction. Viewed in the light most favorable to the State, a rational jury could have found that defendant knew or should have known that Braden and Keister were at Braden's residence. Braden told defendant that her new boyfriend would be coming over on Saturday at 5 p.m., and defendant was angry about her ending their relationship and bringing over her new boyfriend. When he arrived on Saturday to allegedly speak to her about their relationship, he left because no one was home and drove around, he testified, "killing time" until Braden returned. This clearly showed that defendant's goal was to speak to or confront Braden (and likely Keister) on his second trip to the residence.

¶ 88 Specifically, defendant testified that, in September 2017, Braden told him that she did not want to be in a relationship with him anymore. He was shocked by this news and felt "pretty crushed," as his "whole life was" Braden. He also testified that he asked Braden if he could come to her home to retrieve his belongings, but they did not set a date. Defendant further testified that, on September 16, 2017, at 7 or 8 p.m., he went to Braden's house—the first visit—to retrieve his belongings and to finish speaking to her about "what was going on, what was going to happen." When he arrived, he went to the back door (the door he typically used), knocked, waited 10 minutes, and then left. Defendant testified that he rode his motorcycle, filled it with gas, and "kind

of just kill[ed] time." Again, he stated on cross-examination that he was "killing time" so that he could return to the house when Braden was home.

¶ 89 Two hours later, *i.e.*, 9 to 10 p.m., he returned to Braden's house—*i.e.*, the second visit—where, according to defendant, no lights were on. He knocked and tried to open the back door and then went to the front door. Defendant testified that he felt "frustrated" and "upset" about the relationship. He returned to the back door and knocked harder on it. He stated that he wanted to retrieve his belongings and pack up a backpack, but he did not bring a backpack with him. Defendant then went to the side to check the door, but it was not open. He thought about what was going on and decided to kick in the door. Defendant testified that he did not believe that anyone was home, but the circumstances, even as he related them, show otherwise. Defendant returned to Braden's house some time between 9 and 10 p.m., a time during which most people are home. He was "frustrated" and "upset" about the relationship.

¶ 90 Braden testified that, in July 2017, she notified defendant that he had to remove his belongings from her home because she was remodeling and could not store them anymore. She would get rid of anything he did not remove. On September 10, 2017, Braden told defendant that she wanted to pursue a relationship with someone else and that she and defendant should go back to being "just friends." Braden further testified that defendant responded that he did not want to be friends and that he wanted to remove his belongings before Braden brought the man to her house. However, he left when she suggested he take them at that time.

¶ 91 Several days later, on Thursday, according to Braden, she texted defendant to inform him that the man was coming over on Saturday and that, if defendant wanted to remove his belongings before that, he would have to remove them before Saturday. Defendant did not respond, but later Saturday morning, he called her. Defendant was angry, stated he loved Braden, and hoped they

could have been together forever. However, he also stated that she had "some real balls bringing that fucking guy around here." She declined his request to give him the man's name but told defendant that the man would be over at 5 p.m. and that defendant would have to remove his items before then.

¶ 92    Braden further testified that Keister arrived at 5 p.m., they had a glass of wine, and then left to go to dinner. On their way back to Braden's house, Dionysius called to ask if she was home yet and, when Braden replied that she would be home in three minutes, suggested that Keister park his truck in her driveway because defendant went to Braden's home after Braden had left. He was banging on doors, yelling, and looking into windows. Defendant, thus, "kill[ed] time" until he expected Braden would be at the home with Keister, whom he knew she expected that evening.

¶ 93    Braden further testified that, once she and Keister arrived home, they locked the doors and closed the window treatments. Braden related that Dionysius called her and told her that, after defendant arrived, he was unscrewing outdoor light bulbs to turn off the lights. (A photograph of her house taken on the night of the incident showed that the front porch lights were off, and Braden testified that she ordinarily kept the lights on "24/7"; Keister corroborated this testimony, stating that there were no lights on around the exterior of the house when he arrived at Braden's house.) Dionysius testified that defendant attempted to kick in the back door and then succeeded in kicking in one of the deck doors. She did not testify that she saw defendant attempt to knock on any doors, as defendant testified he did. A reasonable jury could have credited Dionysius's testimony on this point and found that, in combination with his actions to turn off the outdoor lights, defendant intended to surprise Braden and Keister. On this point, we reject defendant's argument that turning off the lights would have drawn attention to activity outside the residence. Clearly, defendant would not have been visible to neighbors when he kicked in a door in the dark.

¶ 94    Defendant broke in through one of the French doors off the deck, stating to Keister that he was going to kill him. Defendant testified that there were no lights on when he returned to Braden's house between 9 and 10 p.m. However, Keister testified that a lamp was on near the couch in the room next to the one off the deck. Once inside, defendant did not attempt to discuss his relationship with Braden or to retrieve his belongings but pushed her down and attacked Keister. He then attacked Braden and grabbed a knife and smiled at her and dragged her outside to his motorcycle. All of defendant's actions reasonably reflected that he entered the house intending to harm Braden (and perhaps Keister). Indeed, several witnesses testified to his statement that he was going to kill Keister (Deputy Highland, Braden, and Keister) and Braden (Deputy Highland and Braden). Further, Deputy Freedlund testified that defendant told him that he had to "beat that bitch" for cheating on him.

¶ 95    Defendant's argument that the fact that Braden and Keister whispered while in the house during defendant's second visit showed that they did not want anyone to think there were occupants in the house also fails. A reasonable inference is that they did not want to engage with defendant if he heard them or to reveal their whereabouts in the home while he was there on a second trip to the house that day and trying to gain entry. The closing of the window treatments could reasonably be viewed as furthering the same goal of avoiding engaging with defendant or revealing what Braden and Keister were doing inside the house. Finally, the absence of Keister's truck from Braden's driveway does not necessarily show that defendant believed no one was home.

¶ 96    In summary, the evidence was sufficient to sustain defendant's home invasion conviction.

¶ 97                              B. Sentence

¶ 98    Next, defendant argues that his 20-year sentence for home invasion was excessive in light of his lack of criminal history and his life as a contributing member of society.  For the following reasons, we reject his argument.

¶ 99    The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."  Ill. Const. 1970, art. I, § 11.  The trial court has wide latitude in sentencing a defendant to any term prescribed by statute, "[a]s long as the court does not consider incompetent evidence, improper aggravating factors, or ignore pertinent mitigating factors."  *People v. Hernandez*, 204 Ill. App. 3d 732, 740 (1990).  Relevant sentencing considerations include the nature of the crime, the public's protection, deterrence, punishment, and the defendant's rehabilitative potential.  *People v. Kolzow*, 301 Ill. App. 3d 1, 8 (1998).  The weight that the court should attribute to any factors in aggravation and mitigation depends on the particular circumstances of the case.  *Id.*  The court is not required to cite each factor it considered in fashioning a defendant's sentence.  *People v. Perkins*, 408 Ill. App. 3d 752, 763 (2011).  See 730 ILCS 5/5-5-3.1, 3.2 (West 2020) (factors in mitigation and aggravation).

¶ 100   We review the trial court's sentencing determination for an abuse of discretion.  *People v. Stacey*, 193 Ill. 2d 203, 209 (2000).  We will find an abuse of discretion only where the court's ruling is unreasonable.  *People v. Hall*, 195 Ill. 2d 1, 20 (2000).  We will not disturb a sentence within the applicable sentencing range unless the trial court abused its discretion.  *Stacey*, 193 Ill. 2d at 209-10.

¶ 101   As charged here, home invasion is a Class X felony (720 ILCS 5/19-6(c) (West 2020)), the sentencing range for which is 6 to 30 years' imprisonment (730 ILCS 5/5-4.5-25(a) (West 2020)).  For defendants eligible for extended-term sentencing, the sentencing range is 30 to 60 years'

imprisonment. *Id.* The trial court determined that extended-term sentencing was not appropriate in this case, and it sentenced defendant to 20 years' imprisonment to be served at 85% (*i.e.*, 17 years).

¶ 102   At the sentencing hearing, the trial court noted that it had considered the PSI, testimony, victim impact statements, the sentencing ranges, costs of incarceration, and the statutory factors in aggravation and mitigation.  It found in mitigation that defendant had a minimal criminal record, a positive employment history, a support system available when he should be released, and that he was very helpful to his mother.  It also determined that a significant factor in mitigation was that defendant had found religion while in custody.

¶ 103   However, the court found that Cash's (defendant's mother's) testimony that the incident was out of character for defendant was not credible in light of the pending Wisconsin charges against him and the fact that he had "jumped bail" on several of the charges.  Further, in aggravation, the court found that defendant had planned the attack, had come to Braden's house earlier that evening, tampered with the lights to turn them off, all of which showed "egregious" conduct by defendant.  The court also found that defendant continued to be a danger to Braden and any other person with whom he believed that he had a relationship, referencing the comments that he had to beat Braden.  Further, noting defendant's statements that he wanted to kill Braden and Keister and his stabbing of Braden, the court determined that defendant's conduct threatened serious bodily harm beyond that inherent in the offense of which he was convicted.

¶ 104   Defendant argues that his sentence, which was over three times the six-year minimum sentence, was excessive because he was 36 years old at the time of the offense, had no juvenile record, had lived a substantial part of his life without any significant criminal conduct, and maintained continuous employment since 2006.  He is a high school graduate and treated his family

well. Prior to this case, defendant notes, he had never been imprisoned, and he notes that he found renewed faith in God while in custody. Thus, the minimum sentence, he argues, would have been appropriate.

¶ 105 He acknowledges that two people were severely injured but notes that Keister's injuries healed and none of the injuries were life threatening. He was found not guilty of attempt first degree murder, he notes, and was not armed when he entered Braden's home. He also notes that he entered a home he had no authority to enter, but that he was welcome there one week prior to the incident. Defendant urges that the home invasion was out of character. He asks that, if we conclude that the trial court abused its discretion, we reduce his sentence, without a remand, under Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967) to 12 years' imprisonment. Alternatively, he asks us to vacate the sentence and remand for a new sentencing hearing.

¶ 106 We conclude that the trial court did not abuse its discretion in sentencing defendant to 20 years' imprisonment. Defendant does not argue that the court failed to consider any applicable factors. Defendant's sentence was two years over the midpoint of the sentencing range. As noted, the trial court found defendant's actions "egregious" and determined in aggravation that defendant had planned the attack, found that he was likely to offend again, and that he threatened and inflicted serious bodily injury. Defendant imposed on Braden and Keister lingering harm. Braden, who has multiple sclerosis, stated that the incident severely impacted her physical therapy for her disability. In his statement, Keister stated that psychological issues resulting from the incident persisted and that the attack scarred him for life. Under these circumstances, the sentence was not "greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *P. v. Charleston*, 2018 IL App (1st) 161323, ¶ 16.

¶ 107   In summary, the trial court did not abuse its discretion in sentencing defendant to 20 years' imprisonment.

¶ 108                                    III. CONCLUSION

¶ 109   For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 110   Affirmed.